**AFFIDAVIT**

I, Than Trung Nguyen, having been first duly sworn, do hereby depose and state:

***INTRODUCTION AND AGENT BACKGROUND***

1.      I have been a Special Agent with Internal Revenue Service – Criminal Investigation ("IRS-CI") since October 2018.  My responsibilities include the investigation of tax fraud, money laundering, and the illegal structuring of financial transactions.  I hold a bachelor's degree in economics from Boston College and master's degrees in accounting and business administration from the University of Massachusetts, Boston.  I have received extensive training in financial investigative techniques, money laundering, Bank Secrecy Act violations, and the law of search and seizure under the Fourth Amendment.

2.      I am investigating Wallace Ford ("Ford"), Erin Brown ("Brown"), Adiana Pierre ("Pierre") and Gardy Alexandre ("Alexandre") (together, the "Targets") for their involvement in wire fraud, bank fraud, bank and wire fraud conspiracy, false statements to a financial institution, theft of government funds, concealment money laundering, unlawful financial transactions, and money laundering conspiracy in violation of 18 U.S.C. §§ 1343, 1344, 1349, 1014, 641, 1956(a)(1)(B)(i), 1956(h), and 1957 ("the Target Offenses").

3.      I submit this affidavit in support of a criminal complaint charging each of the Targets with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and conspiracy to commit unlawful monetary transactions, in violation of 18 U.S.C. § 1956(h), based on evidence detailed below that they agreed conspired with each other and with others to submit numerous fraudulent loan applications to banks to obtain Paycheck Protection Program ("PPP") loans and to engage in financial transactions with the fraudulently obtained loan proceeds.

4.      I also submit this affidavit in support of an application for a warrant under 18 U.S.C. §§ 2703(a) and Rule 41 of the Federal Rules of Criminal Procedure to search and seize records and data from the email account identified as docsts2020@gmail.com (the "Target Email Account"), as described in Attachment A to the proposed warrant to search that account.

5.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit does not set forth all facts developed during the course of this investigation and does not set forth all of my knowledge about this matter.  It is intended to show that there is probable cause to believe that the Targets have committed the Target Offenses and that there is probable cause for the requested warrants.

### *PROBABLE CAUSE TO BELIEVE THAT A FEDERAL CRIME WAS COMMITTED*

6.      Ford lived in Palm Beach Gardens, Florida.

7.      Brown, Ford's spouse, also lived in Palm Beach Gardens, Florida.

8.      Pierre lived in Lake Worth, Florida.

9.      Alexandre lived in West Palm Beach, Florida.

10.      Text Savvy, LLC ("Text Savvy"), Our Virtual Services Inc. ("OVS"), and Billy & Jayrie's Miracle, Inc. ("BJM") were companies or not for profit corporations registered in Florida and purportedly operated by Ford and Brown.

11.      Palm Beach Community House Inc. ("PBCH") was a not for profit corporation registered in Florida and purportedly operated by Alexandre.

12.      Borrower 1 was a used car dealer in Massachusetts.

13.      Borrower 2 purported to operate a property management company in Florida.

14.      Borrower 3 operated an auto body shop in Florida.

15.     Borrower 4 also operated an auto body shop in Florida.

16.     Borrower 5 purported to operate a private transportation company in Florida.

17.     Borrower 6 purported to operate a cleaning business in Georgia.

18.     Borrower 7 purported to operate an online beauty products business in Maryland.

19.     Borrower 8 purported to operate a warehouse and cargo delivery business in Massachusetts.

20.     Borrower 9 purported to operate a day care business in New York.[1]

21.     Co-Conspirator 1 ("CC-1"), an associate of Alexandre's, lived in Massachusetts.

22.     The U.S. Small Business Administration ("SBA") was an agency of the United States government authorized to enable and provide for loans, guaranteed by the government, both directly and through banks, credit unions, and other lenders.

23.     Kabbage Inc. ("Kabbage") was based in California.  It was an approved lender of "PPP" loans, which are further described below.

24.     BlueVine was based in California.  BlueVine and several approved PPP lenders, including Celtic Bank and Cross River Bank (collectively referred to as "BlueVine" herein), partnered to accept PPP applications and to originate and disburse PPP loans.

**Overview of Federal COVID-19 Relief Programs**

25.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to Americans suffering the economic effects of the COVID-19 pandemic.

26.     The CARES Act authorized forgivable loans to small businesses and non-profits for job retention and certain other expenses through the PPP.

---

[1] Each of Borrowers 1 through 9 are "Subject Borrowers," as defined below.

27.     In order to obtain a PPP loan, a qualifying business had to submit a PPP loan application signed by an authorized representative of the business.  The PPP loan application required the business, through its authorized representative, to acknowledge the program rules and make certain affirmative certifications.  In the PPP loan application, the small business, through its authorized representative, had to state, among other things, its (i) number of employees and (ii) average monthly payroll expenses.  These figures were used to calculate the amount of a PPP loan the business was eligible to receive; typically, a business was eligible to receive two-and-a-half times its average monthly payroll expenses.  In addition, businesses applying for a PPP loan had to provide documentation of their payroll expenses.

28.     A PPP loan application had to be processed by an authorized SBA lender.  In most instances, applicants submitted applications and supporting documents to PPP lenders electronically.  Kabbage, Bluevine, and other PPP lenders typically recorded the internet protocol ("IP") address from which applications were electronically submitted.

29.     If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were 100 percent guaranteed by the SBA.  Data from the application was regularly transmitted by the lender to the SBA in the course of processing the loan.

30.     PPP loan proceeds had to be used by the business on certain permissible expenses, including payroll costs, interest on mortgages, rent, and utilities.  The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these permissible expenses within a designated period of time and used a certain percentage of the PPP loan proceeds on payroll expenses.

## Overview of the Conspiracy

31.     Between in or around May 2020 and continuing through at least August 2020, the Targets conspired with each other and others to obtain PPP loans for numerous borrowers by submitting fraudulent PPP applications.  These applications falsely reported inflated numbers of employees and total monthly payroll expenses for the borrowers' businesses in order to obtain larger PPP loans.

32.     Pierre, Alexandre, and others recruited individuals to apply for PPP loans for their businesses, non-profits, or sole proprietorships.  Pierre, Alexandre, and their "recruiter" co-conspirators collected information from the borrowing individuals and entities and transmitted this information to Ford and Brown.

33.     Ford and Brown electronically submitted PPP applications that contained false information about employees and payroll on behalf of these borrowers to Kabbage, BlueVine, and other PPP lenders.  Ford and Brown also submitted false documentation with the PPP applications to support false numbers of employees and false amounts of payroll expenses claimed on the PPP applications by the borrowers.

34.     After borrowers received PPP funds based on these fraudulent applications, the borrowers paid kickbacks to the Targets and others, commonly as a percentage of the loan obtained.

35.     Investigators identified at least 27 borrowers (the "Subject Borrowers") for whom the Targets obtained approximately $7 million in PPP funds through loan applications that investigators have confirmed contained fraudulent misrepresentations (the "Subject Applications").  Collectively, the Targets received over $1 million in kickback payments from

Subject Borrowers for the Targets' submission of the Subject Applications and about $490,000 in PPP funds from lenders as a result of fraudulent applications for their own businesses.

### Submission of Fraudulent PPP Applications

36.     During this investigation, I identified a fraudulent application submitted to Kabbage on behalf of Borrower 1, described below.  Kabbage's records indicate that the IP address 134.56.24.34 (the "Target IP Address") was used to submit the PPP application for Borrower 1.

37.     I know based on my experience and training, as well as from information I have received from other investigators, that an IP address is a unique set of numbers assigned to an internet or network device, such as a laptop, a computer, or other web-connected device and that an IP address, in addition to identifying a device, provides geolocation information for the device, including information such as area code, zip code, and city.  Internet service providers also often keep business records indication the physical address associated with an IP address.

38.     Through business records, investigators identified at least 120 additional PPP applications that were submitted from the Target IP Address and/or from the same device (based on common device identification number) to Kabbage or BlueVine between May 2020 and August 2020, including the Subject Applications.

39.     Internet service provider records indicate that the Target IP Address was subscribed to an address in Florida neighboring Ford's and Brown's address during the relevant time period. Bank records reflect that Ford logged into personal and business bank accounts that he alone controlled from the Target IP Address.

40.     I have reviewed bank records for numerous recipients of PPP loans from the applications submitted to the Target IP Address.  After receiving PPP funds, several borrowers transferred money to Text Savvy (Ford and Brown's business), Pierre or her consulting business,

and/or Alexandre or PBCH (his business).  On several occasions, Alexandre or Pierre transferred money to Text Savvy or each other after receiving payments from borrowers.  In many cases, the amounts transferred were in round percentages of the amount of the received loan (*e.g.*, 10 or 20 percent).

41.     I have reviewed telephone records for phone numbers subscribed to Ford, Brown, and Alexandre.  Phone records indicate that both Alexandre and Brown had communicated with Pierre since the beginning of 2020, prior to the passage of the CARES Act.  Between late May 2020 and August 2020, when many of the applications were submitted from the Target IP Address, Alexandre, Brown, and Ford exchanged frequent phone calls and text messages and had multiple interactions per day nearly every day in June 2020.  Throughout this period, Alexandre exchanged phone calls and text messages with at least 11 of the Subject Borrowers.

42.     Investigators searched an email account associated with Pierre pursuant to a court-issued warrant.  Pierre's email account contained data showing the following:

a.      Between on or about May 28 and June 2, 2020, Pierre forwarded to Brown several emails that Pierre received from Kabbage and BlueVine, each addressed to "Adiana" and requesting additional documentation for a PPP loan application.  In one, Pierre wrote, "Good morning Erin[,] Can your hubby check this out for me please?"  Pierre subsequently sent Brown an email attaching a purported 2019 IRS Form 1040 (U.S. Individual Income Tax Return), with a Schedule C (Profit or Loss From Business) for a tax preparation business.[2]

---

[2] I reviewed tax return information for Pierre pursuant to an *ex parte* order, and I have determined that the Form 1040 and Schedule C that Pierre sent to Brown were not the forms that Pierre filed with the IRS for tax year 2019.  The tax return that Pierre filed with the IRS for 2019 showed significantly less income for the year and did not include a Schedule C.

b.      On or about May 30, 2020, Pierre sent Brown an email with the subject "Greg 300k." The email contained a photograph of Alexandre's Florida driver's license and a photograph of a print-out of the Florida Division of Corporations' online profile of PBCH (Alexandre's business). Handwritten on the print-out were the names of four individuals and the amount "$300,000." Shortly after this email, Pierre sent Brown another email with the subject "Push for 300k." As described further below, a PPP application for PBCH was submitted from the Target IP Address to Kabbage on or about June 2, 2020, requesting a loan of $300,000.

c.      Also on May 30, Pierre sent Brown an email with the subject line "Joseph 100k." The email contained a photograph of a Florida driver's license for one of the Subject Borrowers and a screenshot of the online profile of the Subject Borrower's business. Kabbage's records indicate that a Subject Application for this business was submitted from the Target IP Address on that same day.

d.      On or about June 2, 2020, Pierre sent Brown two emails, each with the names of a Subject Borrower in the subject line. In one, for Borrower 1 (described further below), Pierre wrote, "Push for 900k His net worth is 2 million per year!" She attached to this an IRS letter showing Borrower 1's business's EIN, a photocopy of Borrower 1's Massachusetts driver's license, and a license to operate a used articles business.

e.      On or about June 6, 2020, Alexandre sent Pierre an email with the subject "Information for clients." The email contained a table listing the following fields: Business Name, EIN, Business Address, Business Phone Number, Applicant Full Name, Applicant Social, Applicant D.O.B., Applicant Phone Number, Applicant Address, Requested Amount, Bank Name, Bank Routing Number, Bank Account Number.

f.      Between on or about June 6 and June 8, 2020, Pierre forwarded to Brown 20 purported 2019 tax returns that another individual had sent to her.  In the June 6 email, Pierre wrote, "Schedule C for some you may started [sic] already."

g.      Throughout June and July 2020, Alexandre and other individuals sent to Pierre articles of incorporation, bank statements, tax returns, copies of checks and utilities bills, and other documents for businesses or non-profit organizations, and Pierre forwarded those emails to Brown. For example, on or about June 25, 2020, Pierre forwarded to Brown an email from Borrower 5 containing a certificate of formation and bank statement for Borrower 7's business.  Pierre wrote to Brown, "600k."  None of the emails that Pierre forwarded to Brown contained information about the businesses' or organizations' employees or payroll expenses, other than any wage information reported on tax returns.

h.      On or about June 23, 2020, Brown sent Pierre an email with the subject "Commission Receipt."  The body of this email contained a table with columns for "Applicant," "Loan amount," "10% of Loan," "20% Pay," "Agreed Amount," and "Paid out."  The table listed 10 Subject Borrowers, including Borrower 1, Borrower 2, and Borrower 5, described further below, for which the row listed loan amounts of $800,000, $500,000, and $600,000, respectively. Brown sent Pierre an updated version of this table on or about July 1, 2020, which added an $800,000 loan for Borrower 3 (also described further below) to the table, and wrote, "Hey hun please see your receipt below and let me know if you have any questions."

i.      Also on or about June 23, 2020, Brown sent an email to Pierre with the subject "Applicant status."  Attached to this email was an Excel spreadsheet, labeled "PPP," which listed names and corresponding loan amounts for approximately 11 borrowers in a tab labeled "Approved."  Pierre responded, "Thank you for the update."

j.     On or about June 30, 2020, Ford emailed to Pierre "a reconsideration letter for [borrower name] to send to Kabbage" and told Pierre how to instruct the borrower to submit the letter to Kabbage.  The reconsideration letter was a form letter that contained no information specific to the borrower.

k.     On or about July 3, 2020, Pierre received an email from the Target Email Account, which attached a spreadsheet named "Applicant Form."   In Pierre's emails, the Target Email Account appears as "Documents TextSavvy" in the email headers.  The first tab of the Applicant Form spreadsheet, labeled "Waiver," directed applicants to submit documents to the Target Email Account.[3]  The second tab, labeled "Applicant Form 1," includes, among other fields, the questions "How many employees do you have," "did you file a W3 Tax form in 2019," and "Did you file form a Schedule C Tax Form in 2019[.]"  This tab advised, "You will receive a username and password for a created email to review and manage communication with the lending company." Over the following several days, Pierre sent the Applicant Form spreadsheet to four individuals.  I have not located any completed Applicant Form spreadsheet in Pierre's email account.  However, thereafter, Pierre forwarded various documents that she received from applicants to the Target Email Account.

l.     On or about July 21, 2020, Brown sent Pierre an email with the subject "Approved." The email listed 19 names, including the names of 17 Subject Borrowers.

---

[3] This tab also included the following certification: "I certify that the information and certifications provided in this application and in all supporting documents and forms continues [sic] to remain true and accurate in all material respects.  I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000."  This language is nearly identical to a certification on the SBA's official PPP application.

m.      On or about July 30, 2020, Pierre forwarded to the Target Email Account several documents relating to another borrower and wrote, "Let's get her done ASAP!  The boss said I'm not sending enough lol[.]"

n.      Emails indicate that Pierre continued to correspond with the Target Email Account regarding PPP "second draw" loan applications, loan forgiveness applications, and other pandemic relief throughout 2021.[4]   For example, in or around December 2020, one of the Subject Borrowers—a self-described computer technician who had received a $400,000 PPP loan as a result of an application submitted by Ford—emailed Pierre an "Expense Report," itemizing expenses of over $442,000 for the period between June 5, 2020 (the date that Ford submitted the PPP application) and November 30, 2020.  Pierre forwarded this Expense Report to the Target Email Account and wrote, "This is for [borrower name].  He wants to do the loan forgiveness program."  The following day the Subject Borrower emailed Pierre a version of the Expense Report updated to show purported payroll costs of over $340,000, which, if true, would have qualified his business for forgiveness of the PPP loan.  Pierre forwarded this document to the Target Email Account and wrote, "[Borrower name] updated expenses."  The Target Email Account replied, "Hey Addy, Please have [borrower name] do the following," and provided instructions for the Subject Borrower to log in to the website of Kabbage's successor loan servicer.

43.      Based on the foregoing information, I have concluded that Alexandre and Pierre identified potential applicants for PPP loans and provided those applicants' information to Brown

---

[4] Emails from the Target Email Account in 2021 instruct Pierre and applicants to provide applicants' 2019 or 2020 1040-Schedule C.  For example, several emails state, "If you have not completed 1040 Schedule C for 2019, fill it out and compute the value for line 31. We cannot accept this form for previous years. If line 31 on the 1040 Schedule C is less than $2,400, your business is not eligible for a PPP loan."  Investigators have not identified applications submitted by Ford in 2021 to determine whether those applications also contained fraudulent representations about borrowers' payroll expenses.

and Ford.   Ford then submitted applications to Kabbage, BlueVine, and other PPP lenders electronically, from the Target IP Address.   Further, I have determined that applicants who received PPP loans as a result of applications submitted by Ford paid Alexandre, Pierre, Ford and Brown, and other kickbacks or "commissions" after receiving loan proceeds.

44.      Ford submitted the Subject Applications on behalf of business or non-profit entities and self-employed individuals located in Florida, Georgia, Maryland, Massachusetts, and New York.   Fourteen of the Subject Applications resulted in loans in amounts greater than $80,000, totaling over $6.6 million.   Many of the remaining Subject Applications resulted in loans to purported sole proprietors in amounts generally between $20,000 and $30,000.

45.      For each of the Subject Applications, investigators identified one or more indicia of fraud based on information provided on the application, supporting documentation submitted with the application, public records filed by the borrower (or lack thereof), and/or bank records revealing payment of a kickback and/or improper use of PPP funds.[5]

a.      *Supporting documentation:*   For each Subject Application, Ford submitted documents purporting to demonstrate the borrower's payroll expenses or other business information.   Most commonly, Ford submitted a Form W-3 or a Form 1040 Schedule C that purported to show total wages in amounts that supported the average monthly payroll expense amount listed on the PPP application.   For 15 of the 16 Subject Applications that resulted in loans of over $80,000, Ford submitted Forms W-3 that, based on my training and experience, I know were falsified.   I reviewed tax return information for each of these borrowers pursuant to an *ex parte* order, and only two of these borrowers filed an IRS Forms 941 (Employer's Quarterly

---

[5] Investigators have not reviewed information for every PPP application that PPP lenders have identified as having originated from the Target IP Address.   PPP lenders generally did not maintain full records of applications that they or the SBA rejected.

Federal Tax Return) reporting information about wages paid to employees.[6]  With respect to the two borrowers that filed Forms 941, those forms reported wages paid in amounts significantly lower than the payroll expenses claimed on the submitted PPP applications.  Additionally, the Forms W-3 exhibited several infirmities, such as amounts of withheld taxes equal to amounts of corresponding wages (as described specifically with respect to Borrower 1's application, below), incorrect Medicare wages amounts, and/or state taxes withheld without any stage wages reported.[7]  Ford submitted several IRS forms that failed to report any federal income tax, state income tax, Social Security wages or tax, and/or Medicare wages or tax.  Moreover, between on or about June 2, 2020 and on or about June 7, 2020, Ford submitted eight PPP applications for individuals purporting to be self-employed barbers.  Each of these applications stated that the applicant earned a monthly average income of $8,334.  Ford submitted with each of these applications a 2019 Schedule C that stated that the individual earned a net income of $105,236 after expenses in 2019.  These Schedules C were identical with respect to the amount of income reported and, for six of these Schedules C, every expense deducted.  Based on these defects and/or identical submissions, and the fact that I observed none of these Forms W-3 pass through Pierre's email account, I conclude that Ford falsified these IRS forms for the purpose of representing to lenders that borrowers had previously paid wages corresponding to the monthly average payroll expenses claimed on their applications.

---

[6] Information that employers file on Forms 941 typically correspond to the employment data that employers summarize on the Forms W-3 that they submit to the Social Security Administration.

[7] Social Security and Medicare taxes should be a fixed percentage of the associated wages (6.2% and 1.45% respectively) and should not be the same amount as the associated wages.  Additionally, because there is no cap on the amount of Medicare wages that are taxable, Medicare wages should be equal to or greater than the gross wages reported; however, the Forms W-3 submitted by Ford reported lower amounts of Medicare wages.

46.     *Public Records:*  Investigators reviewed public filings submitted by employers to state authorities in Florida and Massachusetts.  These records indicate that borrowers for whom Ford submitted applications did not previously report having the numbers of employees that were claimed on the applications, as required by state law.  For example, records from the Florida Department of Revenue indicate that none of the Florida-based borrowers for whom Ford reported more than one employee on a PPP application had filed Reemployment Tax reports for the preceding period, as required by Florida law.  Similarly, records from the Massachusetts Department of Revenue indicate that Borrower 1 had reported far fewer employees than the 40 employees claimed on the PPP application and that Borrower 8 (described further below) had not filed a report regarding any employees for that period in which his PPP loan application stated that he had 25 employees.  Tax return information indicated that at least 16 of the Subject Borrowers for whom Subject Applications claimed employees in 2019 did not filed employment tax returns for their businesses for the tax year 2019 with the IRS.

47.     *Second Draw Loans:*  In or around January 2021, the SBA began accepting applications for "second draw" PPP loans—additional PPP funds for borrowers who previously received a PPP loan.  Pierre's email correspondence shows that, beginning in or around January 2021, Pierre transmitted to the email address "getmypppnow@gmail.com" business information for several of the borrowers who received PPP loans through applications submitted by Ford in June or July 2020.  Information that Pierre transmitted for second draw applications conflicted with information reported on the initial PPP applications.  For example, Ford submitted a PPP application for a computer technician on or about June 5, 2020 and reported on that application that the technician had 25 employees and average monthly payroll expenses of $160,000.  Ford submitted with this application a purported 2019 Form W-3 that reported gross wages paid of

$1,920,000.  As a result, the technician received a PPP loan of $400,000 on or about June 9, 2020.

However, in January 2021, Pierre forwarded to getmypppnow@gmail.com information for the

technician's business, including a Schedule C that listed total expenses for 2019 of only $15,775

and no wages paid by the business.  These subsequent, inconsistent second draw applications

further show that Ford fabricated the numbers of employees and amounts of monthly payroll

expenses reported on the June through August 2020 PPP applications, as well as the purported

Forms W-3 submitted with those applications.[8]

48.     *Kickbacks and Improper Uses:*  From a review of select bank records, investigators

also observed that, after receiving PPP funds, several of the borrowers made transfers that were

inconsistent with PPP requirements, such as large transfers to the business owner(s), spouses, and

family members or purchases of vehicles and, in at least one case, a new residence.  Further, as

described further below each of these loan recipients paid a kickback or "commission" to at least

one of the Targets, and, in many cases, borrowers made payments to two or three of the Targets or

other recruiters.  For example, the purported computer technician Subject Borrower described

above paid $40,000 each to Text Savvy and Alexandre, transferred approximately $60,000 to his

spouse, purchased a Cadillac for approximately $22,000, and diverted over $140,000 for the

benefit of a tropical restaurant that he and his spouse owned.

49.     Several examples of fraudulent loan applications that the Targets caused to be

submitted are provided below.

---

[8] Based on my review of email records, I believe that the subscriber of the
getmypppnow@gmail.com email address is another associate of Pierre's and that Pierre sent this
associate information for submitting second draw PPP applications on behalf of several of the
borrowers for whom Ford previously submitted an initial PPP application.

*Borrower 1*

50.    Bank records shows that Massachusetts-based Borrower 1 received a PPP loan of $836,800 from Kabbage for his business, a used car dealership, on or about June 5, 2020.  The Subject Application submitted to Kabbage represented that Borrower 1's business had 40 employees and average monthly payroll expenses of $334,720.

51.    The supporting documentation for the application submitted to Kabbage included a purported copy of a 2019 Form W-3 (Transmittal of Wage and Tax Statements) for Borrower 1's business.  This form indicated that the business's gross payroll expenses in 2019 were $3,840,000 and that the company withheld $384,000 in federal income taxes.  The Form W-3 also reported that the business paid $238,080 in Social Security wages and withheld that same amount in Social Security taxes, and that it paid $55,680 in Medicare wages and withheld that same amount in Medicare taxes.

52.    Based on business records and the investigation to date, I have determined that the application to Kabbage vastly overstated Borrower 1's employees and payroll expenses:

a.    In two prior PPP applications that Borrower 1 submitted to other PPP lenders, as well as two applications for Economic Injury Disaster Loan ("EIDL") funds that Borrower 1 submitted to the SBA in 2020, Borrower 1 stated that his business employed only two to four individuals and had 2019 payroll expenses of far less than the amount that the Kabbage PPP application reported.

b.    Records from the Massachusetts Department of Revenue show that Borrower 1's business reported, for the second quarter of 2020 (during which Kabbage received the PPP application), 12 employees and gross wages of $27,616 (approximately $9,205 per month).

c.    Federal tax return information, which I have reviewed, indicates that Borrower 1 did not file employment tax returns for his business for the tax year 2019.

d.    Further, bank records for Borrower 1 and his business do not reflect the payroll activity represented on the Kabbage PPP application. The income and expenses reflected in the bank records are not consistent with a dealership with 40 employees and yearly payroll expenses of $3.8 million, as represented in the PPP application package.

a.    There is probable cause to believe the Form W-3 that was submitted for Borrower 1's business was fabricated. The amounts reported on this Form W-3 are inconsistent with IRS forms that Borrower 1 submitted in support of prior applications, described above. Further, I have reviewed IRS records with respect to Borrower 1 pursuant to an *ex parte* order, and those records do not include any Forms 941 or W-3 reporting employee or wage information. Additionally, the purported Form W-3 submitted to Kabbage exhibited several of the infirmities common to other purported Forms W-3 that Ford submitted, including identical amounts listed for Social Security and Medicare taxes and their associated wages, as well as other errors.

53.    Based on bank records and phone records, there is probable cause to believe that Alexandre and CC-1 recruited Borrower 1 to apply for a PPP loan through the Targets:

a.    Telephone records indicate that CC-1 regularly communicated with both Alexandre and Borrower 1 earlier in 2020, before the PPP application for Borrower 1's business was submitted to Kabbage. Alexandre contacted Borrower 1 on June 3, 2020—the day that the application was submitted—after speaking with CC-1. After Alexandre's initial call to Borrower 1, the two exchanged several more calls and text messages on June 3, 2020, as well as calls and text messages on several other occasions throughout the remainder of June 2020.

b.      Bank records demonstrate that, shortly after receiving PPP funds from Kabbage, Borrower 1 sent two checks totaling $28,000 to PBCH (Alexandre's business).  The memo line on the first check, dated June 9, 2020, stated "payroll check."  The memo line of the second check, dated June 12, 2020, read "services."[9]

54.      Bank records reflect that, after receiving kickback payments from Borrower 1, Alexandre transferred a portion of those payments to Ford.  Shortly after receiving the first check from Borrower 1, on or about June 11, 2020, Alexandre issued a check for $8,000 to Text Savvy (Ford and Brown's business).  After depositing the second check from Borrower 1, on or about June 15, 2020, Alexandre issued a check for $13,000 to Text Savvy on or about June 18, 2020.

55.      In addition to the kickback payments to Alexandre, bank records reflect that Borrower 1 used PPP funds for expenses that were inconsistent with PPP requirements.  For example:

a.      Borrower 1 made a series of payments disguised as payroll checks, but at least $28,857 of these payments were endorsed either to Borrower 1's brother or sister-in-law, and at least $25,000 was subsequently transferred back to Borrower 1.

b.      Borrower 1 paid $133,000 for a 2014 Rolls Royce Wraith for his own use.

c.      Borrower 1 also paid $257,049.79 in costs for a new residence that he purchased in his sister's name.

---

[9] The "Commission Receipt" table that Brown emailed to Pierre, described above, indicated that Borrower 1 was expected to pay $80,000 (*i.e.*, ten percent of $800,000). Investigators have not identified kickback payments from Borrower 1 in addition to the $28,000 that Borrower 1 paid to PBCH.

*Borrowers 2, 3, and 4*

56.     On or about June 1, 2020, Pierre sent to a Florida-based individual ("Person 1") an email that contained the name, address, and employer identification number (EIN) of a purported property maintenance business in Miami, Florida; the name and Social Security number of Borrower 2; and bank account information.   Person 1 responded, "You missing the bank statement[.]"  Pierre then emailed Person 1: "He said can y'all create on[e] for him.  He doesn't have any."  Person 1 replied, on or about June 2, 2020, "No, I can't.  The bank account dont need to have money[.]" Pierre responded, "He didn't have the account until last week.   Does that matter?"  Pierre's email account contains no other messages between Pierre and Person 1.  Based on these messages and the investigation to date, I believe that Pierre attempted to cause Person 1 to submit a PPP application on behalf of Borrower 2 before she began coordinating with Ford and Brown.

57.     Business records indicate that, on or about June 4, 2020, a Subject Application was submitted to Kabbage from the Target IP Address on behalf of Borrower 2's business.   The application stated that Borrower 2 had 20 employees and average monthly payroll expenses of $200,000.  The application requested a PPP loan in the amount of $500,000.

58.     Kabbage approved the loan and disbursed $500,000 to the specified bank account for Borrower 2 on or about June 5, 2020.

59.     On or about June 8, 2020, Borrower 2 purchased a $50,000 cashier's check payable to Text Savvy and a $20,000 cashier's check payable to Pierre.

60.     On or about June 18, 2020, Borrower 2 sent Pierre an email that attached electronic articles of incorporation for Borrower 3's auto body shop.  Business records indicate that, on that same day, a Subject Application was submitted to Kabbage from the Target IP Address on behalf

of Borrower 3.  The application requested a loan of $800,000, based on 40 employees and average monthly payroll expenses of $320,000.  Kabbage approved this application and disbursed $800,000 to an account controlled by Borrower 3 on or about June 24, 2020.

61.     The Florida Department of Revenue did not locate records of any wage reports filed by Borrower 3 for 2019 or 2020.  I reviewed bank records for Borrower 3, and I did not observe any payroll-related expenses before or after Borrower 3's receipt of PPP funds.

62.     Within days of receiving PPP funds, Borrower 3 purchased three cashier's checks, each for $80,000 (*i.e.*, 10% of the PPP loan amount), payable to Pierre, Text Savvy, and Borrower 4.

63.     On or about June 29, 2020 and July 6, 2020, Borrower 2 purchased a series of cashier's checks, totaling $66,190.  These checks listed different individual payees and specified that they were for "payroll" or "backpay payroll."  Two of these checks were issued to Borrower 2 personally, and all the other checks were cashed at a check cashing business.  I have reviewed bank records for accounts for Borrower 2's business.  These account records did not reflect any payroll-related payments between January 2020 and June 2020.  Based on my knowledge of PPP rules—specifically, the requirement to submit proof of payroll expenses for later forgiveness of the PPP loan—I believe that Borrower 2 purchased these checks to create the appearance of payroll expenses.

64.     On or about July 8, 2020, Pierre sent Borrower 2 the "Applicant Form" spreadsheet (described above) and wrote, "Have client fill this out[.]"  Based on my review of Pierre's emails, described above, I believe that Ford and/or Brown instructed Pierre to direct potential borrowers to complete this form, and that Pierre sent this form to Borrower 2 in anticipation of Borrower 2

referring one or more additional borrowers to Pierre. However, as noted above, I have not identified any completed forms of this kind in Pierre's email account.

65.     Investigators interviewed Borrower 3 on or about August 19, 2021. Borrower 3 stated that Borrower 4, for whom Borrower 3 previously worked, offered to assist Borrower 3 with applying for a PPP loan in 2020. According to Borrower 3, Borrower 4 and another individual, unknown to Borrower 3, visited Borrower 3's shop and gathered information about his Social Security number, contact information, business license, driver's license, and bank account information. Borrower 3 stated that he understood that Borrower 4 and the other individual would apply for a PPP loan for him, but that he did not know what amount of a loan that they would request or that he would receive. Borrower 3 stated that he had not provided them with information about his employees, business income, or payroll expenses and that he did not provide them with articles of incorporation or other documents. He stated that he had never seen the loan application or supporting documents that were submitted to Kabbage, including the Form W-3, and that he had never paid $3.8 million in payroll expenses, as the Form W-3 reported. Borrower 3 stated that, after he received the PPP funds, Borrower 4 accompanied him to the bank and instructed him to write the three cashier's checks. I believe that the unknown male with Borrower 4 was Borrower 2, based on Borrower 2's email transmission of articles of incorporation for Borrower 3's business to Pierre.

*Borrowers 5, 6, and 7*

66.     Business records reflect that, on or about June 9, 2020, a Subject Application was submitted to Kabbage from the Target IP Address on behalf of Borrower 5. The application stated that Borrower 5 had 25 employees and average monthly payroll expenses of $240,000 during the

prior year.  Kabbage approved the application and disbursed $600,000 to a bank account for Borrower 5 on or about June 16, 2020.

67.     The Florida Department of Revenue did not locate any records relating to Borrower 5's business.  I have reviewed bank records for Borrower 5, and I observed no payroll-related expenses between April 15, 2019, when the account was first opened, and the receipt of PPP funds. The only receipts I observed between January 2020 and receipt of the PPP funds totaled $29,092, $26,981 of which came from Uber or Lyft and are consistent with payments for completing trips for those companies.

68.     Bank records indicate that, on or about June 17, 2020, Borrower 5 purchased two cashier's checks, each for $60,000, payable to Pierre and Text Savvy.  Over the following week, Borrower 5 also transferred approximately $225,000 to family members and to himself, via cashier's checks and cash withdrawals, as well as $100,000 to another individual by cashier's check.

69.     On or about June 18, 2020, Pierre emailed Brown with Borrower 5's email address and wrote, "This gentleman wants to apply for the forgiveness program."

70.     Between on or about June 18, 2020 and July 8, 2020, Borrower 5 sent Pierre numerous emails with attachments relating to at least 11 different businesses or non-profit organizations.  Pierre forwarded these emails to Brown.  Business records indicate that Kabbage received applications for these businesses or non-profits that were submitted from the Target IP Address attributed to Ford.  Of these, Kabbage approved the loan applications for the following businesses:

a.     Borrower 6's business, which received a PPP loan of $300,000, based on 15 employees and average monthly payroll expenses of $120,000 claimed on the application; and

b.      Borrower 7's business, which received a PPP loan of $600,000 based on 30 employees and average monthly payroll expenses of $240,000 claimed on the application.

71.     I have reviewed bank records for both of these businesses.  Based on these records, neither business paid any payroll-related expenses in 2019.

72.     On or about June 26, 2020, after receiving PPP funds for his business, Borrower 6 transferred $30,000 to Pierre, $30,000 to Text Savvy (Ford and Brown's business), as well as $60,000 to another individual who, based on emails between Borrower 5 and Pierre, I believe introduced Borrower 6 to Borrower 5.

73.     On or about July 2, 2020, after receiving PPP funds for her business, Borrower 7 transferred $120,000 and $75,000 to two of the businesses whose information Borrower 5 had sent to Pierre and Pierre had forwarded to Brown, but whose applications Kabbage did not approve. Based on these payments, I believe that these payees had introduced Borrower 7 to Borrower 5. Borrower 7 also withdrew over $31,000 in cash.

74.     On or about July 7, 2020, Pierre emailed Borrower 5, attached the "Applicant Form" spreadsheet (described above), and instructed him, "Please have all clients fill this out."  As with Borrower 2, I believe that Pierre sent this form to Borrower 5 in anticipation of Borrower 5 referring one or more additional borrowers to Pierre.  However, I have not identified any completed forms of this kind in Pierre's email account.

*Other Subject Borrowers*

75.     Ford submitted a Subject Application for Borrower 8's business on or about June 9, 2020, the day after Borrower 8 spoke by phone with CC-1.  Borrower 8's business was not registered with Massachusetts until April 2020 and did not open a bank account until June 2020. Nonetheless, the PPP application stated that Borrower 8's business had 25 employees and average

monthly payroll expenses of $125,541.  The application was supported by a Form W-3 with defects consistent with those described above; for example, the Form W-3 indicated that the business paid $89,280 in Social Security wages and withheld that same amount in Social Security taxes, and that the business paid $20,880 in Medicare wages and withheld that same amount in Medicare taxes. Phone records show that Borrower 8 communicated with Alexandre by phone on or about June 13, 2020 and exchanged several phone calls and text messages with Alexandre between on or about June 13 and 17, 2020.  On or about June 15, 2020, Kabbage approved the application. Kabbage disbursed $313,852 to Borrower 8's business on or about June 17, 2020.  Bank records demonstrate that, between on or about June 19, 2020 and July 3, 2020, Borrower 8 sent four checks totaling $62,670 to PBCH (Alexandre's business).  Shortly after receiving the first three of these checks, Alexandre purchased a cashier's check for $30,000 payable to Text Savvy.  Borrower 8 also sent five checks totaling $45,000 to CC-1 between June 19, 2020 and July 31, 2020.

76.     On or about June 24, 2020, Borrower 9 emailed Pierre with information about her day care business and instructed Pierre to "please apply for $950k."  Pierre forwarded Borrower 9's email to Brown with the message "new client."  Business records indicate that Kabbage received an application for Borrower 9's business that same day, which stated that the business had 35 employees and an average monthly payroll of $285,518.  Kabbage approved this application and disbursed $713,793 to the business on or about July 1, 2020.  Thereafter, on or about July 11, 2020, Borrower 9 purchased two cashier's checks, each for $71,379 (*i.e.*, 10% of the PPP loan amount), payable to Pierre's consulting business and to Text Savvy.  I reviewed bank records for Borrower 9's business, and I did not observe any payroll-related expenses prior to the loan application.  Further, the only individual payees after the receipt of PPP funds were Borrower 9 and her husband.

*Targets' PPP Loans*

77.     Each of the Targets also received PPP loans as a result of fraudulent submissions to Kabbage by Ford.

78.     Ford submitted a PPP application for Text Savvy to BlueVine on or about April 27, 2020; an application for BJM to Kabbage on or about May 9, 2020; and an application for OVS to BlueVine on or about May 29, 2020.   The Text Savvy and BJM applications each reported that these businesses had ten employees and average monthly payroll expenses of $11,648 and $15,600 respectively.   BlueVine approved the Text Savvy application and disbursed $29,121 to Ford's bank account on or about May 1, 2020, while Kabbage approved the BJM application and disbursed $39,000 to Ford's bank account on or about May 12, 2020.   The OVS application reported that OVS had five employees and average monthly payroll expenses of $40,000.   BlueVine approved the OVS application and disbursed $100,000 to Brown's account on or about June 6, 2020.   In total, Ford and Brown obtained $168,121 in PPP funds through these applications.

79.     I have reviewed Ford's bank records, and they do not support his representations about his payroll expenses.   Based on my review of bank records, there is probable cause to believe that Ford inflated the employee and payroll information on each of these applications.   The Forms W-3 submitted with the BJM and OVS applications also stated Social Security and Medicare taxes withheld equal to the corresponding wages, while the employment tax return submitted with the Text Savvy application was never filed with the IRS.

80.     Alexandre initially submitted a PPP application for PBCH to another PPP lender on or about April 10, 2020 and requested a PPP loan of $55,332, based on $22,133 in reported monthly payroll expenses.   The PPP lender rejected this application.   On or about June 2, 2020 and June 9, 2020, Ford submitted PPP applications for PBCH to Kabbage and BlueVine,

respectively.  Both applications requested a loan of $300,000 and reported that PBCH had 20 employees and average monthly payroll expenses of $120,000.  In support of both applications, Ford submitted a purported 2019 Form W-3 that stated Social Security and Medicare taxes withheld equal to the corresponding wages, from which I have determined that the Form W-3 was falsified.  I have reviewed PBCH's bank records, and they do not include show any payments resembling payroll expenses.  Kabbage flagged the application for potential fraudulent activity.  BlueVine approved the applications for PBCH submitted by Ford, and BlueVine disbursed $300,000 to PBCH on or about July 23, 2020.  The same day that PBCH received loan funds, Alexandre purchased a cashier's check for $30,000 payable to Text Savvy.

81.     Pierre initially submitted a PPP application to BlueVine on or about May 3, 2020, which BlueVine rejected.  On or about June 2, 2020, Ford submitted a PPP application to Kabbage for Pierre's purported financial consulting business.  The application reported average monthly payroll expenses of $8,334 for one employee.  In support of this application, Pierre emailed Brown a purported 2019 Schedule C which reported Gross Income of $111,567.  I have reviewed Pierre's tax returns and tax return information pursuant to an *ex parte* order, and the IRS never received the Schedule C that Pierre attached to this loan application.  Further, bank records for Pierre do not support the monthly payroll expenses or the gross income reported on this application.  As a result of this fraudulent application, Kabbage disbursed a PPP loan in the amount of $20,833 to Pierre on or about June 4, 2020.

## Kickback Payments

82.     I have reviewed bank records with respect to each of the Subject Borrowers.  The bank records show that each Subject Borrower made a payment to at least one of the Targets after

receiving loan proceeds based on the fraudulent loan applications.  In numerous instances, a Subject Borrower made payments to two or even three of the Targets or other recruiters.

83.     Ford and Brown—through Text Savvy and OVS—received at least approximately $528,122 from Alexandre and at least 10 Subject Borrowers, including a $40,000 cashier's check from the purported computer technician borrower, a $50,000 cashier's check from Borrower 2, an $80,000 cashier's check from Borrower 3, a $60,000 cashier's check from Borrower 5, a $30,000 transfer from Borrower 6, and a $71,379 cashier's check from Borrower 9, as described above.

84.     Pierre directly received at least approximately $406,772 from at least nine Subject Borrowers, including a $20,000 cashier's check from Borrower 2, an $80,000 cashier's check from Borrower 3, a $60,000 cashier's check from Borrower 5, a $30,000 transfer from Borrower 6, and a $71,379 cashier's check from Borrower 9, as described above.

85.     Alexandre received at least approximately $143,760 from at least four Subject Borrowers, including a $40,000 cashier's check from the purported computer technician borrower, two $14,000 checks from Borrower 1, and four checks for $15,690 each from Borrower 8, as described above.

86.     Additionally, Borrower 4 received the $80,000 kickback from Borrower 3, and another recruiter received kickbacks totaling $180,000 from two of the Subject Borrowers, including $120,000 from Borrower 7.

**Probable Cause to Search the Target Email Account**

87.     There is probable cause to believe that the Target Email Account and associated data contain evidence, fruits, and instrumentalities of the Target Offenses.

88.     Based on the name associated with the Target Email Account—"Documents TextSavvy"—I believe that Ford and/or Brown used the Target Email Account in connection with

submitting PPP applications, under the name of the Text Savvy business that they had previously registered.

89.     As described above, Pierre's email records indicate that Pierre corresponded with the Target Email Account beginning in July 2020 in connection with the submission of PPP applications by Ford and Brown on behalf of numerous borrowers.  Pierre's correspondence with the Target Email Account continued through at least in or around February 2022.

90.     Further, the Applicant Form spreadsheet that the Target Email Account emailed to Pierre, and which Pierre emailed to several individuals, instructed applicants to submit documents to the Target Email Account.

91.     I am aware, based on my training and experience investigating computer-enabled crime, that subjects often use email accounts to communicate with coconspirators and to create and activate financial accounts.  I also am aware that subjects often use Google services to store and transfer images and/or documents, to store contacts, and to maintain calendar entries related to fraudulent activity.

92.     Based on the emails that I observed in Pierre's email account, as well as the connection between the fraudulent PPP applications and the Target IP Address and Ford, there is probable cause to believe that Ford and/or Brown used the Target Email Account to communicate with other Targets, recruiters, and borrowers about the submission of fraudulent PPP applications and to facilitate the submission of those applications and the collection of kickback payments.

93.     On December 3, 2022, Assistant U.S. Attorney David Holcomb sent Google a letter requesting under 18 U.S.C. § 2703(f) that Google preserve records associated with the Target Email Account for 90 days.

### *TECHNICAL BACKGROUND FOR SEARCH OF TARGET EMAIL ACCOUNT*

94.     Based on my training and experience, I understand that Google and other email providers allow customers to store opened incoming mail and sent mail indefinitely if they choose, subject to a maximum size limit.

95.     Email providers also typically maintain electronic records relating to their customers.  These records include account application information, account access information, and email transaction information.  Based on my training and experience, I know that this information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  Providers such as Google also commonly have records of the IP address used to register the account and the IP addresses associated with other logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account.  Also, providers such as Google typically collect and maintain location data related to subscriber's use of Google services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

96.     Based on my training and experience, I know that providers such as Google also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers.  Such devices can be identified in various ways.  For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned

by Google in order to track what devices are using Google's accounts and services.  Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI").  Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other Google accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the Google account.

      97.    Based on my training and experience, I know that providers such as Google use cookies and similar technologies to track users visiting Google's webpages and using its products and services.  A "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer.  When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to Google.  More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by providers such as Google may constitute evidence of the criminal activity under investigation.  By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a Google account and determine the scope of criminal activity.

      98.    Based on my training and experience, I know that Google maintains records that can link different Google accounts to one another, by virtue of common identifiers, such as

common email addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple Google accounts.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful in identifying the person or persons who have used a particular Google account.

99.     Based on my training and experience, I know that Google can also provide the following additional information associated with a subscriber's account:  address books; buddy lists; photos, files, data, or other information; and World-Wide Web profiles or homepages.

### *LEGAL AUTHORITY FOR SEARCH OF TARGET EMAIL ACCOUNT*

100.    The government may obtain both electronic communications and subscriber information from an email provider by obtaining a search warrant.  18 U.S.C. §§ 2703(a) and 2703(c)(1)(A).

101.    Any court with jurisdiction over the offense under investigation may issue a search warrant under 18 U.S.C. § 2703(a), regardless of the location of the website hosting company or email provider whose information will be searched.  18 U.S.C. § 2703(b)(1)(A).  Furthermore, unlike other search warrants, § 2703 warrants do not require an officer to be present for service or execution of the search warrant.  18 U.S.C. § 2703(g).

102.    If the government obtains a search warrant, there is no requirement that either the government or the provider give notice to the subscriber.  18 U.S.C. §§ 2703(b)(1)(A), 2703(c)(3).

103.    This application seeks a warrant to search all responsive records and information under the control of Google, a provider subject to the jurisdiction of this court, regardless of where Google has chosen to store such information.  Pursuant to 18 U.S.C. § 2713, the government intends to require the disclosure pursuant to the requested warrant of the contents of wire or

electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Google's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

### *REQUEST TO SEAL AND PRECLUDE NOTICE TO THE SUBSCRIBER(S)*

104.    I request that this application, the warrant, the order, and any related papers be sealed by the Court until such time as the Court pursuant to Local Rule 7.2 directs otherwise.

105.    I further request that, pursuant to the preclusion-of-notice provisions of 18 U.S.C. § 2705(b), the Court order Google, respectively, not to notify any person (including the subscriber to whom the materials relate) of the existence of this application or the Court's Order for the earlier of one year from the date of the Court's Order or upon notice by the government within 30 days of the conclusion of its investigation, unless the Court extends such period under 18 U.S.C. § 2705(b). Non-disclosure is appropriate in this case because the Court's Order relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the existence of the investigation. There is accordingly reason to believe that notification of the existence of the Order will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, or change patterns of behavior. *See* 18 U.S.C. § 2705(b). Moreover, some of the evidence in this investigation is stored electronically. If alerted to the existence of the Order, the targets could destroy that evidence, including information saved to their personal computers, on other electronic media, or in social media accounts.

### *FOURTEEN-DAY RULE FOR EXECUTIONS OF WARRANT*

106.    Federal Rule of Criminal Procedure 41(e)(2)(A),(B) directs the United States to execute a search warrant for electronic evidence within 14 days of the warrant's issuance.  If the Court issues the applied-for warrants, the United States will execute it not by entering the premises of Google, as with a conventional warrant, but rather by serving copies of the warrants on Google and awaiting Google's production of the requested data.  This practice is approved in 18 U.S.C. § 2703(g), and it is generally a prudent one because it minimizes the government's intrusion onto Internet companies' physical premises and the resulting disruption of their business practices.

107.    Based on my training and experience and that of other law enforcement, I understand that e-mail providers sometimes produce data in response to a search warrant outside the 14-day period set forth in Rule 41 for execution of a warrant.  I also understand that e-mail providers sometimes produce data that was created or received after this 14-day deadline ("late-created data").

108.    The United States does not ask for this extra data or participate in its production.

109.    Should Google produce late-created data in response to the applied-for warrants, I request permission to view all late-created data that was created by Google, including subscriber, IP address, logging, and other transactional data, without further order of the Court.  This information could also be obtained by grand jury subpoena or an order under 18 U.S.C. § 2703(d), neither of which contains a 14-day time limit.  However, law enforcement personnel will seek to avoid reviewing any late-created data that was created by or received by the account-holder(s), such as e-mail, absent a follow-up warrant.

110.    For these reasons, I request that the Court approve the procedures in Attachment B, which set forth these limitations.

## CONCLUSION

111.   Based on the information described above, I have probable cause to believe that that each of the Targets have violated 18 U.S.C. §§ 1349 and 1956(h) in connection with the submission of fraudulent loan applications and engagement in financial transactions with fraudulently obtained loan proceeds.

112.   I further have probable cause to believe that evidence, fruits, and instrumentalities of the Target Offenses, as described in Attachment B to the proposed warrant to search the Target Email Account, are contained within the Target Email Account described in Attachment A.

Sworn to under the pains and penalties of perjury,

Than Nguyen
Special Agent
IRS, Criminal Investigation

Sworn to via telephone in accordance with Federal Rule of
Criminal Procedure 4.1 on January ___, 2023:

**Jan 24, 2023**

Hon. Judith G. Dein
United States Magistrate Judge